**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TARIQ WYATT,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:22-CV-92** |
| **v.** | : | **(JUDGE MANNION)** |
| **CHRISTINA HAUSER*, et al.,*** | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Plaintiff Tariq Wyatt, who was incarcerated at the State Correctional Institution at Mahanoy in Frackville, Pennsylvania ("SCI-Mahanoy") during the times relevant to this lawsuit, filed this *pro se* Section 1983 action on January 18, 2022. (Doc. 1). He asserts First, Fifth, Eighth and Fourteenth Amendment claims against multiple prison officials, alleging that Defendants violated his rights due to a series of events, which include a nurse handing him medications without wearing gloves, his temporary placement in a Psychiatric Observation Cell ("POC"), the issuance of misconduct reports for his behavior and related sanctions, cold conditions in the Restricted Housing Unit ("RHU"), and the taking of some of his property. This alleged campaign of abuse against him was inflicted, in part, as "preemptive" retaliation for grievances he had not yet filed about prison officials' behavior towards him.

Presently pending before this Court is Defendants' and Plaintiff's motions for summary judgment. (Docs. 76 and 80, respectively). For the following reasons, the Court will **DENY** Plaintiff's Motion for Summary Judgment **(Doc. 80)** and **GRANT** Defendants' Motion for Summary Judgment **(Doc. 76)**.

## I.   <u>BACKGROUND</u>

Plaintiff, Tariq Wyatt, is a state prisoner who was housed at the State Correctional Institution at Mahanoy, SCI-Mahanoy. On January 18, 2022, Wyatt filed a *pro se* complaint naming approximately twenty-one correctional officials as defendants. (Doc. 1). An Amended Complaint was filed establishing the identities of several Doe defendants. (Doc. 50). Plaintiff has suffered from mental illness while in custody, and has alleged that he had been subjected to unfair treatment by correctional staff due to his impairments in the pasts. (Doc. 1, ¶¶ 27-43).

On October 5, 2021, Plaintiff had a dispute with a member of the medical staff, Defendant nurse Amy Bing, who placed Wyatt's medication in a cup without wearing gloves. According to Wyatt, Defendant Bing was dispensing the medications for all other inmates in similar fashion. (Doc. 92, Ex. B, p. 19). Wyatt, believing the medication was dispensed in an unsafe and unsanitary fashion, requested Bing to provide him with "a different pill" since she "ha[d] no gloves on." (*Id.*, p. 12). At such point, Defendant Bing

returns to her cart, where the medications are held, and retrieves, out of Wyatt's sight, medication in a cup and says "here." (*Id.*). Wyatt believes that Defendant Bing, with sleight of hand, pretended to replace the medication with a different cup but instead simply brought back the same medication in the same cup. (*Id.*, p. 20). Consequently, Wyatt begins to yell and scream for his medication. (*Id.*). Defendant Bing asserted that she had placed another medication capsule in a different paper cup to divert negative behavior from Wyatt and that Wyatt began screaming "Give me my fucking pills. I want my fucking pills" while holding a threatening stance over her. (Doc. 92, Ex. C, p. 9).

Wyatt contends that he did not curse but does admit he yelled and screamed at Defendant Bing "want[ing] everybody to hear it, hear [him] loud and clear" that he wanted his medication. (Doc. 92, Ex. B, p. 22). Wyatt received a misconduct report from this incident, which he claims was "bait[ed]" by Defendant Bing to get her "little hit off of [him]," (*Id.*, p. 23), and as "preemptive retaliation" for Wyatt filing a grievance against her despite the fact that he had not yet filed a grievance or had any interaction with Defendant Bing previous to that incident. (*Id.*, pp. 34-36). Wyatt ultimately submitted a grievance regarding this matter, and among the numerous

defendants he implicates, he included Defendant Nurse Hauser for simply having responded to his grievance in a manner he disapproved. (*Id.*, p. 30).

Due to Wyatt's erratic behavior, he was assigned to a Psychiatric Observation Cell, POC, where he was seen by medical staff until his release the next day. (*Id.*, p. 26; *see also* Doc. 92, Ex. E). Wyatt named Defendant Lieutenant Davis for placing him in the POC "as a punishment for not cooperating," (*id.*, p. 26), and Defendant Dreher, the shift commander, for not handling the misconduct in the manner Wyatt would have preferred – which is to discount Defendant Bing's report and find, Wyatt contends, that "'stand[ing] in a threatening manner' … is not a reason to send somebody to the RHU."[1] (*Id.*, p. 28). Wyatt contends that he would have to threaten with words "to them or their family or something like that" to warrant being placed in the POC. (*Id.*, p. 29).

Wyatt contends that, while in POC, Defendant Correctional Officer Fritzinger denied him access to hygiene supplies at first, but Wyatt also admits having received such supplies the next day. (Doc. 92, Ex. B, pp. 39-40). Another named Defendant, Correctional Officer Flynn, provided Wyatt with the supplies he requested. (*Id.*, p. 41). Wyatt was in POC for a single

---

[1] Though Plaintiff said RHU (Restrictive Housing Unit) during his deposition, he was not sent to the RHU but the POC after the incident.

day. (*Id.*). Furthermore, Wyatt alleged that that the POC "was kind of cold" when he first got in there, as well as the RHU and the whole facility, because "[t]he heat went off that day, and [he] think[s] they were trying to fix it." (*Id.*, p. 39).

On October 8, 2021, Wyatt had a hearing on the misconduct reported three days prior, where the hearing examiner, Defendant Dupont, found that Plaintiff was guilty of using abusive language and found the testimony of Defendant Nurse Bing to be credible. (Doc. 92, Ex. D, p. 1). Wyatt contends that he was unfairly treated because he was denied a witness (Correctional Officer Alexy) who would have allegedly confirmed Wyatt's version of events; i.e., that he didn't curse when he was screaming at the nurse. (Doc. 92, Ex. B, pp. 42-43). However, according to Wyatt himself, Alexy himself told Wyatt that he was not going to serve as his witness. (*Id.*, p. 61). Nevertheless, Wyatt was consequently placed in RHU for his misconduct.

That same day, Wyatt covered the windows of his cell door in RHU with toilet paper and sheets of paper – obstructing any prison officials from seeing within – because Wyatt was frustrated that staff members "keep telling [him] that everything [was] going to be okay" when he was not allowed a witness for his misconduct hearing. (*Id.*, pp. 43-44; Doc. 92, Ex. F). Wyatt was given multiple direct orders to uncover his door but Wyatt refused to

comply and was unresponsive. (Doc. 92, Ex. F, p. 10). Consequently, prison officials deployed OC spray to gain his compliance. (*Id.*, pp. 5, 10). Wyatt received another misconduct based on this behavior to which he pled guilty to the charge presented in the report. (Doc. 92, Ex. G).

After the spraying, Wyatt was removed from the cell and triaged by a medical staff member, Defendant Nurse Landmesser. Defendant Landmesser began a standard medical check up of Wyatt, asking him where he is injured, if at all, and when she was instructed to decontaminate Wyatt from the OC spray, she did so. This chain of events took about five minutes. (Doc. 92, Ex. H at 4:55). Wyatt contends that Defendant Landmesser was abusively dithering instead of counteracting the painful effects of the OC Spray. However, this contention is belied by the video evidence. Wyatt contends that fifteen to twenty minutes passed as Defendant Landmesser refused to assist him, but the video evidence clearly shows that she flushes his eyes as soon as it is brought to her attention that she is to do so, which occurs less than five minutes after her arrival. (*Id.*). Defendant Captain Banks placed Wyatt on paperwork restriction for his use of such to cover up his window. (Doc. 92, Ex. B, p. 55). Wyatt believed that this treatment was unfair and contends that he should have been restricted from only toilet paper for his behavior and not paperwork, which would include legal paperwork that

- 6 -

he can use to file a lawsuit, and thus accuses Defendant Banks for violating his constitutional rights. (*Id.*, p. 55-56). The restriction was temporary.

Afterwards, when Wyatt was taken to RHU to serve the time for his misconduct, his property was to be stored away after being inventoried. (*Id.*, pp. 63-69). Defendants Rodriguez, Guzenski and Evans, among others, were involved in the inventorying of Wyatt's property and the handling of his filed grievance regarding such property. (*Id.*). The property taken from Wyatt included, among others, "some books and magazines," a television, a religious medallion and art supplies. (*Id.*, p. 69). The only property that Wyatt took issue with being taken was the medallion, art supplies and television. (*Id.*). All the property was returned or replaced. (*Id.*). Defendant Dreher was the shift commander at the time, and his involvement is limited to that role. (*Id.*, pp. 26-28).

Wyatt implicates numerous defendants for responding to his grievances in a manner he disagreed. For example, Wyatt named Defendant Mason, the Superintendent of SCI-Mahanoy, because Defendant Mason told Wyatt to appeal his misconduct sanction but ultimately upheld the sanction. (*Id.*, pp. 58-59). Defendant nurse Hauser is implicated for reviewing Wyatt's grievance against Defendant Bing, for which Wyatt believes is improper given both Defendants Hauser and Bing make part of the same medical staff.

(*Id.*, pp. 30-31). Defendants White, MacKnight and Chuma make part of the Program Review Committee and their implication in the suit is due to their decision to affirm the judgment on Wyatt's misconducts. (*Id.*, pp. 56-57). Defendants Mahally, Walter and Guzenski's involvement is limited to responding to Wyatt's grievances in a manner that Wyatt disagrees. (*Id.*, pp. 69, 71, 73). Wyatt was unsure what Defendant Sokaloski's involvement in the lawsuit was and believes he might have mixed him up with Defendant Guzenski. (*Id.*, p. 73).

The Pennsylvania Department of Corrections ("DOC") has established a formal policy and a procedures manual for inmates, which must be followed by inmates who file grievances while incarcerated at state correctional institutions operated by the DOC. The purpose of a grievance is to allow an inmate to bring concerns and complaints to the attention of prison officials. The grievance procedures are set forth in the DOC's Administrative Directive 804 ("DC-ADM 804"), titled *Inmate Grievance System*. (Doc. 92, Ex. J). Pursuant to the DC-ADM 804, the DOC has a three-tiered grievance system which serves as an inmate's administrative remedy: (1) an initial review by a Grievance Officer, (2) appeal to the Facility Manager or designee; and (3) appeal to the Secretary's Office of Inmate Grievance and Appeals for final review. (*Id.*). Pursuant to DC-ADM 804, a grievance must be submitted in

writing, using the grievance form available on all housing units or blocks, within 15 working days after the events noted in the grievance. (*Id.*). A grievance must include the following: a statement of facts relevant to the claim during the date and approximate time and location of the event(s) giving rise to the grievance; the identity of any individuals who were directly involved in the event(s); any claims the inmate wishes to make concerning violations of DOC directives, regulations, court orders, or other law; and any compensation or legal relief desired. (*Id.*). Upon receipt, the Facility Grievance Coordinator assigns each grievance (even a rejected grievance) a tracking number and enters it into the Automated Inmate Grievance Tracking System. (*Id.*). If an inmate is dissatisfied with the initial response, he or she may appeal that decision to the Facility Manager. (*Id.*). The Facility Manager then provides a written response to the grievance. The Facility Manager may uphold the response, uphold the inmate, dismiss the grievance (either as untimely or on the merits), or uphold in part or deny in part. The Facility Manager may also remand the Initial Review Response for further investigation or consideration. (*Id.*). If an inmate is not satisfied with the decision of the Facility Manager, he or she may submit an appeal to the Secretary's Office of Inmate Grievances and Appeals. Only issues raised in both the original grievance and the appeal to the Facility Manager may be

appealed at this level. (*Id.*). The Secretary's Office of Inmate Grievances and Appeals reviews the original grievance, the Initial Response Review, the appeal to the Facility Manager, the Facility Manager's response thereto, and the appeal to final review. (*Id.*). The Secretary's Office of Inmate Grievances and Appeals then may uphold the response, uphold the inmate, dismiss, or uphold in part and deny in part. Alternatively, the Chief Grievance Officer may remand the grievance to the facility for further investigation or reconsideration or may refer the appeal to a different bureau. (*Id.*).

Among the 154 grievances Wyatt has filed while incarcerated at SCI-Mahanoy, eight grievances were filed regarding the series of events related to this matter; particularly, grievances numbered:

- 949383, regarding Defendant Bing not wearing gloves when giving Plaintiff his medication;

- 950467, regarding Defendant Evans for allegedly "stealing" Plaintiff's television when such television was ultimately replaced;

- 950481, regarding the taking of Plaintiff's religious medallion which was ultimately returned;

- 950547, regarding the incident with OC spray and the cold conditions;

- 950549, regarding Plaintiff's stay in POC;

- 950824, regarding a comment made by Defendant White;

- 951864, regarding responses to grievances by Defendant Mahally;

- 952020, regarding property being taken from Plaintiff.

(Doc. 92, Ex. I). None of the grievances were appealed by Wyatt for final review.

After the filing of the Complaint, Defendants moved for dismissal of the action. (Doc. 17). Defendants' motion was denied, and the parties were permitted to proceed with discovery. (Doc. 28). Discovery closed on May 31, 2024. (Doc. 85). Defendants filed a motion for Summary Judgment on April 1, 2024. (Doc. 76). Plaintiff filed a motion for Summary Judgment on April 15, 2024. (Doc. 80). Defendants filed a statement of facts on July 31, 2024. (Doc. 92). Plaintiff filed his statement of facts in the form of exhibits to his brief in support of his Motion for Summary Judgment (Doc. 91, Ex. A) which are selected pages of his misconduct reports that show the Plaintiff had requested witnesses for his misconduct hearing (specifically, CO Alexy) and that Defendant Banks approved of Plaintiff's temporary placement in RHU with a restriction on use of paperwork. With all briefs submitted, the motions are ripe for review.

II.    **LEGAL STANDARD**

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses*." Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that could alter the outcome" of the litigation, and "disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)); *Matsushista Electric Industrial Company, Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 587 (1986) ("[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial").

At the Rule 56 stage, the Court's function is not to "weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court must view the facts and evidence presented "in the light most favorable to the non-moving party" and must "draw all reasonable

inferences in that party's favor." *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014). A "scintilla of evidence" supporting the nonmovant's position is insufficient; "there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 252) (alteration in original). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by ... denying averments ... without producing any supporting evidence of the denials." *Thimons v. PNC Bank, NA*, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted).  Thus, "[w]hen a motion for summary judgment is made and supported ..., an adverse party may not rest upon mere allegations or denial." *Fireman's Ins. Co. of Newark New Jersey v. DuFresne*, 676 F.2d 965, 968 (3d Cir. 1982); *see Sunshine Books, Ltd. v. Temple University*, 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." *Lockhart v. Hoenstine*, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985) (citing *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir. 1981)); *Nat'l Labor Rel. Bd. v. FES*, 301 F.3d 83, 95 (3d Cir. 2002) ("[The plaintiff's]

testimony ... amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment.").

## III.   DISCUSSION

Defendants contend that Wyatt cannot meet his Rule 56 burden because he cannot adduce any competent evidence to support his bare allegations. The Court agrees.

Defendants have asserted that Wyatt failed to exhaust the prison grievance process, cannot produce any admissible evidence that would establish the elements of his First, Fifth,[2] Eighth and Fourteenth Amendment claims other than his own self-serving, conclusory allegations, and Wyatt has not identified any record evidence that would rebut this assertion. The Court agrees. Wyatt has not, for example, pointed to a declaration or affidavit other than his own repeated bare allegations, or any other evidence that could sustain a verdict in his favor. At summary judgment, "the non-moving party must oppose the motion and, in doing so, may not rest upon the mere allegations or denials of his pleadings but, instead, must set forth specific facts showing that there is a genuine issue for trial. Bare assertions,

---

[2] Defendants contend that there does not appear to be a claim under the Fifth Amendment relevant to this action. After review of all the filings in this matter, the Court agrees, and this claim is dismissed.

conclusory allegations, or suspicions will not suffice." *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288-89 (3d Cir. 2018) (alteration omitted) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268-69 (3d Cir. 2014)). The Court will nevertheless address each of the parties' arguments in turn.

## A. Failure to Exhaust Administrative Remedies

Defendants contend that Plaintiff failed to exhaust his administrative remedies and his claims are consequently procedurally defaulted. The Court agrees.

Under the Prisoner Litigation Reform Act (PLRA), a prisoner may not bring an action with respect to prison conditions "until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). Exhaustion is mandatory, *see Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007); *see also Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"); *Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir. 2000) (same), and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion must also be "proper," the prisoner

must comply with all administrative requirements so that the agency can address the issues on the merits. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006); *Williams*, 482 F.3d at 639. Claims that have not been properly exhausted are procedurally defaulted. *Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004); *Couch v. Tritt*, 2016 WL 278776 at *5 (M.D. Pa. Jan. 22, 2016) ("Inmates who fail to fully, or timely, complete the prison grievance process, or who fail to identify the named defendants, are barred from subsequently litigating claims in federal court."). To determine whether a prisoner has "properly" exhausted a claim, the court must evaluate the prisoner's compliance with the prison's administrative regulations governing inmate grievances. *Id.* "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007); *see also Woodford*, 548 U.S. at 90-91.

Here, the applicable procedural process governing inmate grievances and appeals is the DOC Administrative Directive 804 (DC-ADM 804). The process begins with the submission of a grievance form and a response thereto. If an inmate is dissatisfied with the initial response to his grievance, he may file an appeal to the facility manager in writing, within fifteen working days from the date of the initial review/rejection. An inmate dissatisfied with the decision of the facility manager may appeal to final review with the chief

of SOIGA within fifteen working days from the date of the facility manager's decision.

Wyatt was well aware of the grievance process when he used it 154 times while incarcerated at SCI-Mahanoy. (Doc. 92, Ex. I, ¶9). Among the 154 grievances Wyatt has filed, eight relate to the claims Wyatt raised in his Complaint:

- 949383, regarding Defendant Bing not wearing gloves when giving Plaintiff his medication;

- 950467, regarding Defendant Evans for allegedly "stealing" Plaintiff's television when such television was ultimately replaced;

- 950481, regarding the taking of Plaintiff's religious medallion which was ultimately returned;

- 950547, regarding the incident with OC spray and the cold conditions;

- 950549, regarding Plaintiff's stay in POC;

- 950824, regarding a comment made by Defendant White;

- 951864, regarding responses to grievances by Defendant Mahally;

- 952020, regarding property being taken from Plaintiff.

(Doc. 92, Ex. I). None of the grievances were appealed by Wyatt for final review. Wyatt has not alleged any facts that demonstrate he was somehow unable to appeal his grievances. Due to Wyatt's failure to exhaust his administrative remedies, his claims are procedurally defaulted and summary judgment should be granted in favor of the Defendants on that ground alone. However, given the fatal flaws existent in Wyatt's claims above the procedural defect, this Court will nevertheless continue through its analysis demonstrating the other grounds upon which summary judgment will be granted in favor of the Defendants.

## B. Lack of Personal Involvement

Defendants submit that the record is devoid of evidence from which a reasonable factfinder could conclude that certain defendants were personally involved in any of the alleged constitutional violation. Specifically, with respect to Defendants Sokaloski, Flynn, Dreher, Hauser, White, MacKnight, Chuma, Mason, Mahally, Walter and Guzenski.

Section 1983 provides that persons acting under color of state law may be held liable if they deprive an individual of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See* 42 U.S.C. §1983. To state a Section 1983 claim, a plaintiff must plead two essential elements: (1) the conduct complained of was committed by a

person acting under color of state law; and (2) the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). Individual liability can be imposed under Section 1983 only if the state actor played an "affirmative part" in the alleged misconduct, and "cannot be predicated solely on the operation of *respondeat superior*." *Evancho v. Fishser*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998)). In other words, a defendant "must have personal involvement in the alleged wrongs ... shown through allegations of personal direction or of actual knowledge and acquiescence[.]" *See Atkinson v. Taylor*, 316 F.3d 257, 270 (3d Cir. 2003) (quoting *Rode*, 845 F.2d at 1207).

Allegations of personal involvement must be made with appropriate particularity in that the complaint must allege the particulars of conduct, time, place, and personal responsibility. *Evancho*, 423 F.3d at 354; *Rode*, 845 F.2d at 1207-08. Subsequent knowledge of an incident is insufficient to demonstrate that a state actor played an "affirmative part" in the alleged misconduct. *See Rode*, 845 F.2d at 1207-08 (the after-the-fact submission of a grievance is "simply insufficient" to establish a defendant's knowledge of an underlying constitutional violation at the time it occurred); *Dooley v.*

*Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (Grievance Coordinator and Superintendent's involvement in review and denial of grievance insufficient to establish personal involvement). It is the plaintiff's burden to "show that each and every defendant was 'personal[ly] involve[d]' in depriving him of his rights." *Kirk v. Roan*, No. 1:04-CV-1990, 2006 WL 2645154, at *3 (M.D. Pa. Sept. 14, 2006) (quoting *Evancho*, 423 F.3d at 353). Allegations that broadly implicate multiple defendants without delineating individual conduct are legally insufficient. *See Van Tassel v. Piccione*, 608 F. App'x 66, 69-70 (3d Cir. 2015). Accordingly, against this precedential backdrop, the Court will review whether each of the aforementioned defendants had the requisite personal involvement to be liable under §1983.

### 1) *Administrative Respondents*

Plaintiff has alleged that the following defendants violated his rights for either responding to grievances he filed or affirming the decision on grievances and misconduct reports. To wit:

- Defendant Hauser is a nurse, and her involvement is only responding to grievances. (Doc. 92, ¶18).

- Defendants White, MacKnight, and Chuma are the Program Review Committee; their involvement is limited to upholding Plaintiff's misconducts. (Doc. 92, ¶19).

- Defendant Superintendent Mason supervises SCI-Mahanoy, and in this action appears to be limited to having once told Plaintiff to appeal a sanction that she later upheld anyway. (Doc. 92, ¶20).

- Defendants Mahally, Walter, and Guzenski's involvement is limited to responding to grievances. (Doc. 92, ¶21).

Thus, the allegations against these Defendants amount to their responses to grievances and misconducts in a manner that the Plaintiff is unhappy with. "[T]he failure of a prison official to act favorably on an inmate's grievance is not itself a constitutional violation." *Little v. Mottern*, 2017 WL 934464, at *11 (M.D. Pa. Mar. 7, 2017) (quoting *Rauso v. Vaughn*, 2000 WL 873285, at *16 (E.D. Pa., June 26, 2000). Such allegations are insufficient to establish the above-named Defendants' personal involvement in the challenged conduct under Section 1983. *See Watkins v. Horn*, 1997 WL 566080 at *4 (E.D. Pa. 1997) (concurrence in an administrative appeal process is not sufficient to establish personal involvement); *Mitchell v. Keane*, 974 F.Supp. 332, 343 (S.D.N.Y. 1997) ("it appears from the submissions before the court that [Plaintiff] filed grievances, had them referred to a prison official, and received a letter reporting that there was no evidence to substantiate his complaints. [Plaintiff]'s dissatisfaction with this response does not constitute a cause of action."); *Caldwell v. Beard*, 2008

WL 2887810, at *4 (W.D. Pa. July 23, 2008) ("Such a premise for liability [i.e., for performing a role in the grievance process] fails as a matter of law."), *aff'd*, 2009 WL 1111545 (3d Cir. April 27, 2009); *Orrs v. Comings*, 1993 WL 418361, at *2 (E.D. Pa. Oct. 13, 1993) ("But an allegation that a defendant failed to act on a grievance or complaint does not state a Section 1983 claim."). Accordingly, the claims against such Defendants will be dismissed.

### 2) *Defendant Dreher*

Plaintiff only brought an action against Defendant Dreher for his role as shift commander. (Doc. 92, ¶17). As explained above, a defendant must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence; however, allegations of knowledge and acquiescence must be made with appropriate particularity." *Id.* Additionally, a plaintiff must show that "some affirmative conduct by the supervisor played a role in the discrimination." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990); *see also Rizzo v. Goode*, 423 U.S. 362, 377 (1976) (supervising officials do not violate the constitutional rights of the victims unless they have played an "affirmative part" in the misconduct). Plaintiff has

made no such showing and, accordingly, summary judgment will be granted in favor of Defendant Dreher.

### 3) *Defendant Sokaloski*

During his deposition, Plaintiff admitted that he was unsure why he even named Defendant Sokaloski, and may have confused him with another Defendant. (Doc. 92, ¶22). Given that Plaintiff has shown no personal involvement of Defendant Sokaloski, summary judgment will be granted in favor of Defendant Sokaloski.

### 4) *Defendant Flynn*

During his deposition, Plaintiff admitted that Defendant Flynn came to him while he was at POC and provided Plaintiff with the supplies he requested, such as hygiene products. (Doc. 92, Ex. B, p. 41). Thus, Plaintiff has neither established any violation of his rights nor any personal involvement of Defendant Flynn in any constitutional violations. Accordingly, summary judgment will be granted in favor of Defendant Flynn.

## C. Plaintiff's Constitutional Claims

### 1) *Verbal Abuse*

Plaintiff has alleged that he has been verbally harassed or referred to as a "snitch" by certain Defendants (*i.e.*, Defendants White (Doc. 92, Ex. B, pp.61-62), Counselor (*id.*, pp. 59-58), Evans (*id.*, pp. 64-65), Fritzinger (*id.*,

p. 41) and Rodriguez (*id.*, pp. 66, 68, 69)). Statements and verbal threats, without action, cannot as a matter of law violate a prisoner's rights. *Rodriguez v. Wetzel*, 2015 WL 1033842 at *8 (W.D. Pa. 2015) ("it is well established that the use of words, no matter how violent, vulgar or unprofessional, is not actionable under 42 U.S.C. §1983") (citing *Dunbar v. Barone*, 487 Fed. Appx. 723 (3d Cir. 2012)). Verbal harassment in the correctional setting, while unprofessional and not condoned, simply does not rise to the level of a constitutional violation. *See Gandy v. Reeder*, 2019 WL 2537923, at *2 (3d Cir. 2019) ("…mere insults, without more, cannot constitute as an Eighth Amendment violation."); *Aleem-X v. Westcott*, 347 F. App'x 731, 731 (3d Cir. 2009) ("Verbal abuse of a prisoner, even of the lewd variety [ ], is not actionable under § 1983"). Accordingly, to the extent any of Plaintiff's claims allege constitutional violations related to verbal harassment or verbal abuse, such claims will be dismissed.

### 2) *The Dispensation of Medication and Resulting Misconduct*

Plaintiff admits to having "yelled" and "screamed" at Defendant Bing "want[ing] everybody to hear it, hear [him] loud and clear" that he wanted his medication and refused to take the medication she provided him on two separate occasions because he believed, without seeing, that she dispensed his medication without gloves. (Doc. 92, Ex. B, p. 22). He received

a misconduct due to his behavior. Because of these events, Plaintiff claims that his constitutional rights have been violated. Defendants submit that to the extent that Defendant Bing should have been wearing gloves Plaintiff "does not seem to have the expertise necessary to offer an opinion on" the matter and that Defendant Bing "would be shielded by qualified immunity" regardless. (Doc. 92, p. 13). The Court agrees with Defendants.

Despite their participation in constitutionally impermissible conduct, government officials "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity ensures that before officers are subjected to suit, they have notice that their conduct is unlawful. *Id.* "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818–19.

The qualified immunity analysis has two prongs. *Pearson*, 555 U.S. at 232. One prong of the analysis is whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right. *Id.* The other prong of the analysis is whether the right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

"To determine whether a right was 'clearly established,' we conduct a two-part inquiry." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021). "First, we must 'define the right allegedly violated at the appropriate level of specificity.'" *Id.* (quoting *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012)). "This requires us to frame the right 'in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Saucier*, 533 U.S. at 201). "Second, we must ask whether that right was 'clearly established' at the time of its alleged violation, *i.e.*, whether the right was 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Saucier*, 533 U.S. at 202). "This is an 'objective (albeit fact-specific) question,' where '[an officer]'s subjective beliefs ... are irrelevant.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018). In other words, "[t]he rule must be 'settled law,' which means it is

- 26 -

dictated by 'controlling authority' or 'a robust 'consensus of cases of persuasive authority.'" *Id.* (internal citations omitted). "It is not enough that the rule is suggested by then-existing precedent." *Id.* Rather, "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.*

Defendants submit that there is certainly not a robust consensus of case law indicating that a nurse must wear gloves when dispensing pills to prison inmates. The Court agrees. Furthermore, if the law did not put the defendant on notice that her conduct would be clearly unlawful, qualified immunity is appropriate. *Bayer v. Monroe County Children & Youth Services*, 577 F.3d 186, 193 (3d Cir. 2009). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *al-Kidd*, 563 U.S. at 743). Given the exacting standard, Defendant Bing's conduct does not rise to the level of plain incompetence and a knowing violation of law. Accordingly, Defendant Bing is shielded by qualified

immunity and the claim against her regarding the manner in which she dispensed Plaintiff's medication will be dismissed.

Turning to the misconduct against Plaintiff, Plaintiff offers a convoluted theory of his and Defendant Bing's motivations—namely, that Defendant Bing goaded him into a misconduct, apparently for her own sinister amusement to get her "little hit off of [him]" and as preemptive retaliation for Plaintiff's intended not yet filed (nor announced) grievance against her. (Doc. 92, Ex. B, p. 23).[3] Plaintiff's support for this claim is conclusory, stating, "[p]eole do it all the time …" and commented on the curious way Defendant Bing was handling the medication he was to take. (*Id.*, pp. 22-24). Plaintiff finally noted that "[p]eople be in a certain mood and that they want to write a [misconduct] on somebody. That's what it feels like." (*Id.*, p. 24). Regardless of Plaintiff's feelings on the matter, his suspicions are not evidence.

Plaintiff's goading theory is circular, for a jury to believe that Defendant Bing filed a false misconduct against him to preemptively head off Plaintiff from filing a grievance against her would require such a jury to forego reason and adopt a belief in mind reading. Ultimately, the premise to Plaintiff's circular conclusion is weakened by Plaintiff's own admission that he doesn't

---

[3] Defendants correctly note that Plaintiff remains responsible for his own actions, even if he was provoked (or believed to be so).

even believe anything would have happened to Defendant Bing regardless of whether or not he filed a grievance against her. When confronted with this inconsistency, the following exchange occurred:

> **Q:** Why would staff bother to retaliate against you for filing grievances if nothing ever happens with the grievances anyway?
>
> **A (Plaintiff):** Well, that's what I think, because something does sometimes happen, but they don't tell us, or people tell them -- I really, really believe that this is what happens when somebody does something that you could put a grievance in on. I believe that people are looking at them and they're telling them -- looking at them like they're being weird, like, "You did that?" And I believe that's really their motivation for coming back and trying to retaliate first, because they just want to get you back somehow.
>
> **Q:** So they retaliate against you preemptively for filing grievances. But you don't know if they get in trouble for getting grievances or not, you're not sure?
>
> **A (Plaintiff):** I feel like, sometimes, if you tell somebody in Medical, "Oh, you're giving this guy poison. She's giving somebody poison"; right? -- so then I believe somebody come over to tell them, "Listen, don't do that no more. You give people poison, what's wrong with you? We took care of it, but --" you know what I mean? It's kind of hard to explain.

(Doc. 92, Ex. B, pp. 35-36). As fantastical as Plaintiff's theory may be, even granting him, *arguendo*, that Defendant Bing issued a false or

fabricated misconduct, it still does not state a claim upon which relief may be granted.

> "To invoke the Due Process Clause, an inmate must first identify a liberty interest that has been violated. *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S.Ct. 2384, 2393, 162 L.Ed.2d 174, 189 (2005). It is well established that the act of filing a false disciplinary misconduct does not itself violate a prisoner's constitutional rights even if it may result in the deprivation of a protected liberty interest. *See Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir.1986) (A "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.) However, inmates do have the right not to be deprived of a protected liberty interest without due process of law. *Id.* at 952. Accordingly, "so long as certain procedural requirements are satisfied, mere allegations of falsified evidence or misconduct reports, without more, are not enough to state a due process claim." *Smith v. Mensinger*, 293 F.3d 641, 654 (3d Cir.2002) (citing *Freeman*, 808 F.2d at 953).

*Hutchinson v. Kosakowski*, 2015 WL 373765 at * 4 (M.D. Pa. Jun. 15, 2015). The *Hutchinson* court found the inmate plaintiff in that matter, who also alleged that his due process rights were violated when he was issued a false or fabricated misconduct and denied witnesses at his misconduct hearing, was not deprived of a protected liberty interest and "fail[ed] to state

a due process, or any other, claim against [the defendant]." 2015 WL 373765 at * 5. Similarly here, even assuming, *arguendo*, that Defendant Bing issued Wyatt a false or fabricated misconduct, "so long as certain procedural requirements are satisfied, mere allegations of falsified evidence or misconduct reports, without more, are not enough to state a due process claim." *Id.* (citing *Smith*, 293 F.3d at 654).

Thus, turning to the misconduct hearing itself, due process protections attach in prison disciplinary proceedings in which the loss of good-time credits is at stake. *See Wolff v. McDonnell*, 418 U.S. 539, 564-65 (1974). In *Wolff*, the Supreme Court held that an inmate must receive "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Superintendent v. Hill*, 472 U.S. 445, 454 (1985). Because Wyatt does not allege that he suffered a loss of good conduct time, the *Wolff* protections are inapplicable. Furthermore, the Third Circuit in *Watson v. Rozum*, noted that "to determine whether prison officials' decision to discipline an inmate for his violations of prison policy was within the broad discretion [ ] afford[ed] [to] them," the court must evaluate "the quantum of

evidence" of the misconduct. 834 F.3d 417, 426 (3d Cir. 2016). Here, Defendant Dupont explicitly noted that Defendant Bing presented testimony that was more credible than Plaintiff. Defendant Dupont relied upon that testimony in finding Wyatt's guilt, which is sufficient. Beyond that, Plaintiff admits that he was "yelling" and "screaming" at Defendant Bing with all his might. Not allowing additional witnesses would not have made a difference since Plaintiff essentially admits to the violation for which he was convicted.

Moreover, the Due Process Clause does not provide protection against the imposition of discipline, including disciplinary confinement and the loss of various privileges inasmuch as these other forms of discipline do not "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Torres v. Fauver*, 292 F.3d 141, 150-51 (3d Cir. 2002) (citing *Sandin*, 515 U.S. at 486). Confinement in administrative or punitive segregation is insufficient, without more, to establish the kind of "atypical" deprivation of prison life necessary to implicate a liberty interest. *Sandin*, 515 U.S. at 486; *see Griffin v. Vaughn*, 112 F.3d 703, 706-07 (3d Cir. 1997). Here, Wyatt alleges that he was denied witness testimony of CO Alexy. However, Wyatt does not allege that he was subjected to an atypical and significant hardship. Moreover, placement in disciplinary confinement (such as the RHU or POC) does not impose an atypical and significant

hardship on an inmate in relation to the ordinary incidents of prison life. Accordingly, no aspect of this incident constitutes a constitutional violation and summary judgment will be granted in favor of Defendants on all claims relating to it.

### 3) *POC Placement*

Defendants argue that Plaintiff's brief placement in POC for less than day is not a constitutional violation. The Court agrees.

In order to succeed on a claim as to one's conditions of confinement, a plaintiff must establish that: "(1) he was incarcerated under conditions imposing a substantial risk of serious harm, (2) the defendant-official was deliberately indifferent to that substantial risk to his health and safety, and (3) the defendant-official's deliberate indifference caused him harm." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2015) *abrogated on other grounds by Bistrian v. Levi*, 912 F.3d 79, 96 (3d Cir. 2018). "[T]he Constitution does not mandate comfortable prisons." *Rhodes*, 452 U.S. at 349. Therefore, conditions of imprisonment violate the Eighth Amendment only if they, "alone or in combination...deprive inmates of the minimal civilized measures of life's necessities." *See id.* at 347. Such necessities include "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Thus, "extreme deprivations are required to make out a conditions-

of-confinement claim." *Hudson*, 503 U.S. at 9. However, "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019) (quoting *Wilson*, 501 U.S. at 304 and *Rhodes*, 452 U.S. at 347).

Here, Plaintiff had an overnight stay in POC where he was temporarily denied hygiene supplies but received them the day after. The conditions of such a confinement do not amount to an Eighth Amendment violation. Court has previously found that denial of showers for 15 days does not rise to the level of an Eighth Amendment violation. *Fortune v. Hamberger*, 379 Fed. Appx. 116, 122 (3d Cir. 2010). Furthermore, the Supreme Court has held that "[i]t is well settled that the decision where to house inmates is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 39 (2002). Wyatt was briefly placed in POC for his erratic and aggressive behavior, for which he admits to, and was then appropriately tended to by medical staff. Accordingly, summary judgment will be granted in favor of Defendant Fritzinger relating to the Eighth Amendment claim.

### 4) *Cold Temperature in the RHU*

Defendants argue that Plaintiff's claim that the RHU is cold does not state a constitutional claim. The Court agrees.

The Third Circuit has held that it "is questionable if having a cold cell" is an atypical and significant hardship when "much more harsh conditions" do not violate the Eighth Amendment. *Burkholder v. Newton*, 116 Fed. Appx. 358, 363 (3d Cir. 2004) (citing *Sandlin*, 515 U.S. at 484). Both the Supreme Court and the Third Circuit have held that low cell temperatures may satisfy the objective deprivation requirement of an Eighth Amendment claim, but only if the low cell temperature is exacerbated by other mutually enforcing conditions that deprive the inmate of adequate shelter. *See Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991) (low cell temperature at night combined with failure to issue blankets may establish violation); *Sampson v. Berks Co. Prison*, 117 Fed. Appx. 383, 385-86 (3d Cir. 2006) (low cell temperature combined with refusal to provide additional clothing, move to warmer cell, or take any other measures to ameliorate the cold sufficient to survive motion to dismiss).

Here, Plaintiff never alleged any facts that show the low cell temperature was exacerbated by other mutually enforcing conditions that would deprive him of adequate shelter. If anything, based on his deposition,

he stated that it "was kind of cold" when he first got in there and that "[t]he heat went off that day, and [he] think[s] they were trying to fix it," (Doc. 92, Ex. B, p. 39), effectively mitigating (not exacerbating) the conditions of his confinement. Accordingly, Plaintiff's conclusory allegations are unsupported by any evidence and summary judgment will be granted in favor of the Defendants.

### 5) *Use of OC Spray and Second Misconduct*

On October 8, 2021, Plaintiff covered the windows of his cell and was unwilling to uncover or respond when asked to by prison officials. Accordingly, OC spray was used to gain his compliance. As a result of this incident, Plaintiff was issued a misconduct, to which he pled guilty. In his complaint, Plaintiff alleged that the spray was used as punishment, and the manner in which he was later "detoxed" was violative of his constitutional rights because Defendant Landmesser, Plaintiff alleges, cruelly dithered instead of counteracting the painful effects of the OC spray. Plaintiff has neither alleged sufficient facts to constitute a cognizable claim nor has any presented any evidence to support his conclusory allegations. If anything, the record evidence flatly contradicts Plaintiff's allegations.

As previously explained, prison officials are entitled to qualified immunity which extends to the use of OC spray. "Qualified immunity

balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." *Sharp*, 669 F.3d at 159 (3d Cir. 2012) (citing Pearson, 555 U.S. at 244). Here, as part of Defendant Gunther's duties to gain compliance of an inmate, he may use OC spray, and the deployment of it was reasonable given Plaintiff's behavior of covering the windows of his cell and purposely refusing to respond. (Doc. 92, Ex. B, p. 43) ("I put something on the door so they couldn't see me, and they sprayed me.").

If Plaintiff is arguing that this was excessive force, the core inquiry of an excessive-force claim is "'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Fennell v. Cambria County Prison*, 607 F. App'x 145, 148 (3d Cir. 2015) (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (*per curiam*). In conducting that inquiry, a court must examine the need for the application of force, the relationship between the need and the amount of force used, the extent of injury inflicted, the extent of the threat to the safety of staff and

inmates, and any efforts to temper the severity of a forceful response. *Id.* (citing *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000)). As made clear, the use of force was applied in a good faith attempt by Defendant Gunther to restore discipline and the following efforts of the nurse, Defendant Landmesser, in performing a standard medical checkup of Plaintiff were meant to temper (and counter) the severity of the effects of OC spray. Furthermore, the resulting issuance of the misconduct is clearly supported by the quantum of evidence; a misconduct to which Plaintiff pled guilty to.

As to Plaintiff's allegations against Defendant Landmesser particularly, that she allegedly cruelly and purposefully dithered instead of counteracting the painful effects of the OC spray, such allegations are belied by the video evidence. (Doc. 92, Ex. H). Plaintiff contended that fifteen to twenty minutes passed as Defendant Landmesser refused to assist him, however, the video shows that Defendant Landmasser performs a standard medical checkup of Plaintiff, asking him where he is injured and then flushes his eyes as soon as it is brought to her attention that she is to do so; which is less than five minutes after her arrival. (*Id.*; *see also* Doc. 92, ¶15).  When an opposing party's side of the story is "blatantly contradicted" by clear video evidence on the record, "so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary

judgment." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007); *see, e.g.*, *Fennell*, 607 F. App'x at 148 (ruling that "the District Court properly relied on the videotape of the incident to resolve any factual disputes" between an officer and a state prisoner in an excessive force case). Accordingly, summary judgment will be granted in favor of the Defendants regarding any claims related to the events of October 8, 2021.

### 6) *Property*

Plaintiff claims that he had property taken from him but only takes issue with a medallion, a television and art supplies, all of which were either returned or replaced. (Doc. 92, ¶16). From Plaintiff's deposition, the following interaction occurred:

> **Q:** Okay. And you said what you took issue with was the TV or religious medallion and your art supplies?
>
> **A (Plaintiff):** Right.
>
> **Q:** Did you ever get any of that stuff back?
>
> **A (Plaintiff):** Yeah, I ended up getting my art supplies back and my chain. And the TV, I ended up getting a different TV.

(Doc. 92, Ex. B, p. 69). Not only is there no claim stated but also no damages. Accordingly, summary judgment will be granted in favor of the Defendants.

### 7) *Retaliation*

To state a prima facie case of retaliation in violation of the First Amendment, a plaintiff must establish the following elements: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006); *see also Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000). To amount to retaliation, the conduct must be "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (quotation marks and citation omitted). "Although the elements of a First Amendment retaliation claim remain constant, the underlying concepts that they signify will vary with the setting— whether activity is 'protected' or an action is 'adverse' will depend on context...." *Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999). The fact of incarceration and the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security justify limitations on the exercise of constitutional rights by inmates. *See Pell v. Procunier*, 417 U.S. 817, 822-23 (1974). Thus, a prison inmate "retains [only] those rights

that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.* at 822.

Plaintiff claims, to some extent, that all of the transpiring events make part of the same overarching retaliatory conspiracy against him for filing grievances. As severe as such allegations may sound, they are completely conclusory and vague, and Plaintiff makes no attempt to allege any particular facts connecting any of the alleged retaliatory acts against him to his grievance filings. When Plaintiff was asked for supporting evidence, he responded with the following:

> "Because that's all they do in there. So it become a habit. Now, if I tell somebody that somebody's doing something, first they try to act like they don't believe me; then when I say I'm putting in the paperwork, I end up in a POC. Like I said, everybody knows -- most of the people was walking around telling me that this CO was coming to be a witness, but I can't understand how that didn't happen. You know what I'm saying? I couldn't understand that. The only thing that I could believe right now is, this is all one thing, they all working together. Because there's nothing to say that they wasn't -- you know what I mean? It's like, why did this happen at this point in time? It's only one reason I could see."

(Doc. 92, Ex. B, p. 50). The filing of grievances is a protected activity under the First Amendment, *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003), however, at the outset, it is also clear that Plaintiff "consistently

- 41 -

display[s] a preternatural, global, subjective sensitivity to alleged retaliation, … ascribing some retaliatory motive to virtually every action that occurs at the prison." *Smith v. Price*, 2012 WL 6541008, at *17 (M.D. Pa. Nov. 21, 2012), report and recommendation adopted, 2012 WL 6553651 (M.D. Pa. Dec. 14, 2012). Accordingly, with no competent evidence of retaliation presented, summary judgment will be granted in favor of the defendants.

## IV.    CONCLUSION

For the foregoing reasons, the Court will **DENY** Plaintiff's Motion for Summary Judgment **(Doc. 80)** and **GRANT** Defendants' Motion for Summary Judgment **(Doc. 76)**. An appropriate order will issue.


*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: March 11, 2025**
22-92-01

- 42 -